Keren E Gesund
Nevada Bar No. 10881
GESUND & PAILET, LLC
7464 West Sahara Ave
Las Vegas, NV 89117
Telephone: (702) 300-1180
Facsimile: (504) 265-9492
Email: keren@glolawfirm.com

Melinda Jane Steuer (*pro hac vice* to be filed)
The Law Offices of Melinda Jane Steuer
1107 Second Street, Suite 230
Sacramento, CA 95814
Telephone: (916) 930-0045
Facsimile: (916) 314-4100
Email: msteuer@californiainvestoradvocate.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| MARK ERMENCE AND CARRIE ERMENCE, husband and wife,<br><br>Plaintiffs,<br><br>vs.<br><br>ANDERSON BUSINESS ADVISORS, LLC, a Nevada corporation,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT FOR**<br><br>**1) FRAUD BY CONCEALMENT**<br>**2) BREACH OF FIDUCIARY DUTY**<br>**3) PROFESSIONAL NEGLIGENCE**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Mark Ermence and Carrie Ermence, ("Plaintiffs") complain and allege as follows:

## I.     INTRODUCTION

1.     This case arises out of ANDERSON BUSINESS ADVISORS, LLC ("ANDERSON") material omissions, breaches of fiduciary duty and negligence in promoting and

endorsing CRAIG PONDER, SR. ("C. PONDER") to Mark and Carrie Ermence as part of ANDERSON's team of trusted advisors. C. PONDER defrauded the Ermences out of significant monies. ANDERSON also acted negligently with respect to its performance of the services for which the Ermences paid them. Engaging with ANDERSON and the investment promoters who ANDERSON recommended turned out to be a regrettable and damaging financial decision for the Ermences.

2. Specifically, the "educational" resources provided by ANDERSON included referrals to three individuals who turned out to be scammers but who the Ermences entrusted for financial advice because of their purported affiliation with ANDERSON. The Ermences incurred significant damages as a result. ANDERSON advised the Ermences to establish multiple entities. This proved to be excessive and impractical, and has cost the Ermences significant time and resources without any tangible benefits

## II.   THE PARTIES

3. Plaintiffs are informed and believe, and thereon allege, that Defendant ANDERSON is, and at all times relevant was, a Nevada limited liability company formed under the laws of Nevada, with its principal place of business in Las Vegas, Nevada, domiciled in the State of Nevada and a citizen of the State of Nevada. Plaintiffs are informed and believe, and thereon allege, that, at all times relevant, ANDERSON has done business in the State of Texas, including with Plaintiffs herein.

4. Plaintiffs are, and all times herein relevant were, citizens of the State of Texas who reside in the State of Texas and are domiciled in the State of Texas.

## III.   JURISDICTION AND VENUE

5. The District Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendant are citizens of different states, and the amount in controversy exceeds $75,000.00, as alleged herein.

6. Venue is proper in this district pursuant to the contract between the parties identifying Clark County, Nevada as the venue for the agreement.

### IV.    ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

7.    Plaintiffs are a husband and wife who lost a substantial amount of their life savings and existing insurance due to ANDERSON's misconduct as alleged herein. Mr. Ermence was born May 14, 1969. He earned a degree from Embry Riddle Aeronautical University in 1991. He works in cybersecurity sales. Mrs. Ermence was born June 23, 1970. She earned a degree from the University of Oregon in 1994 in sociology and mass media studies. Mrs. Ermence taught elementary school for many years. At the time that Plaintiffs made the investments at issue, Mr. & Mrs. Ermence had both recently acquired real estate licenses.

8.    At the time of their introduction to ANDERSON, Mr. Ermence had 401(k) and IRA accounts worth approximately $1,000,000.00, which were primarily invested in stocks. Plaintiffs also owned two rental properties with a combined equity of approximately $310,000.00. In addition, Mr. Ermence has a universal life insurance policy with Midland Insurance with a death benefit of $1,000,000.00 and Mrs. Ermence had a universal life insurance policy with Midland with a death benefit of $691,000.00.

9.    On or about February of 2019, Plaintiffs attended a "Think Realty" conference in Dallas to learn more about real estate investing. At that conference, they were introduced to ANDERSON. ANDERSON promoted itself as providing asset and tax protection for real estate investors. Plaintiffs learned that ANDERSON was putting on a workshop the following week. Plaintiffs were interested in what it had to offer, and therefore attended its workshop.

10.    Plaintiffs were very impressed with ANDERSON and believed that they were experts in business and financial matters. At the ANDERSON workshop, they signed up for a "Titanium" membership with ANDERSON. The Plaintiffs paid an initial fee of $15,495 to ANDERSON for its services, which included tax planning, living trust formation, limited liability company formation, and access to its team of advisors and experts. In total, the Plaintiffs paid $41,105.25 to ANDERSON during the three years in which ANDERSON performed legal, tax planning, financial and bookkeeping services for the Plaintiffs.

Those services were not only unnecessary, but they introduced excessive complications and expenses for Plaintiffs which they would not have otherwise incurred without any tangible benefits.

11. At the ANDERSON workshop, Plaintiffs were introduced to CRAIG PONDER SR. ("C. PONDER"). At this workshop, ANDERSON presented C. PONDER as a life insurance expert and a retirement planning expert who was on its team of advisors. C. PONDER gave a presentation at this workshop. In this presentation, C. PONDER claimed to be a fiduciary and discussed why indexed universal life policies ("IULs") were great investments. C. PONDER also had his own designated area at the ANDERSON workshop where he could meet with the attendees who were interested in his services. ANDERSON did not disclose if or that C. PONDER had paid to present or meet with attendees at the ANDERSON workshop.

12. The Plaintiffs met with C. PONDER briefly at the ANDERSON workshop, and scheduled a time for a more in- depth consultation. C. PONDER told Plaintiffs that he typically charged a consulting fee, but that he would provide Plaintiffs with a consultation at no charge. At this meeting, C. PONDER told the Plaintiffs that he worked closely with ANDERSON and that he was planning to move his business operation to Nevada, where ANDERSON was located. The Plaintiffs therefore felt that they could trust C. PONDER, because he had been recommended and endorsed by ANDERSON and appeared to an affiliated advisor of ANDERSON's.

13. Plaintiffs are informed and believe, and thereon allege, that ANDERSON and C. PONDER had an extensive and ongoing business and referral relationship which dated back to at least 2016, if not earlier. Plaintiffs are informed and believe, and thereon allege, that ANDERSON allowed C. PONDER to present at its meetings and workshops as a purported insurance and retirement planning expert who was affiliated with ANDERSON, in exchange for C. PONDER referring his clients to ANDERSON for tax, business, advisory, and/or bookkeeping services. Plaintiffs are informed and believe, and thereon allege, that C. PONDER offered and solicited his clients to purchase different types of service packages from ANDERSON in exchange for a commission and/or a referral fee from ANDERSON and/or as consideration for being allowed to present and meet with clients at ANDERSON's workshops and events. Plaintiffs are informed

and believe, and thereon allege, that C. PONDER either directly paid ANDERSON to present and meet with clients at its workshops and events, and/or directly paid ANDERSON a referral fee and/or a commission for any clients who ANDERSON introduced to C. PONDER who did business with or through C. PONDER. Plaintiffs are also informed and believe, and thereon allege, that C. PONDER indirectly compensated ANDERSON for its referrals to him and for allowing him to present and meet with clients at ANDERSON's workshops by referring his clients to ANDERSON and soliciting them to pay ANDERSON large fees for services which his clients did not need. The foregoing referral/compensation relationship was not disclosed to Plaintiffs. As a result, Plaintiffs reasonably believed at the time that ANDERSON had thoroughly vetted C. PONDER and his services, and was recommending him because he was a knowledgeable and experienced advisor who was part of ANDERSON's team.

14.    The day after the ANDERSON workshop, Mr. Ermence emailed ANDERSON in response to an email it had sent about business planning which it was undertaking for him. In this email, Mr. Ermence stated that they had scheduled a meeting with C. PONDER, "who is affiliated with Anderson Advisors", to provide some financial advice to them. Nobody from ANDERSON advised Mr. Ermence that his understanding of the relationship between C. PONDER and ANDERSON was incorrect, or that C. PONDER was not affiliated with ANDERSON. In fact, a few months later, ANDERSON sent the Plaintiffs an agenda for its executive retreat which featured C. PONDER as one of the speakers at the retreat and promoted C. PONDER's purported expertise as an investment advisor. At no time did ANDERSON indicate that it received any type of financial compensation or consideration for C. PONDER's presentation at its retreat or any other meeting, or that it had any type of ongoing client referral relationship with C. PONDER. Consequently, the Plaintiffs continued to reasonably believe that C. PONDER was one of ANDERSON's affiliated advisors.

15.    Plaintiffs are informed and believe, and thereon allege, that, at all times herein relevant, C. PONDER was an actual agent, authorized agent and/or ostensible agent of ANDERSON who was acting within the scope of that agency relationship in engaging in the acts alleged herein.

Accordingly, ANDERSON is vicariously liable for C. PONDER's wrongful acts which are alleged herein.

16.     Plaintiffs had a one-on-one meeting with C. PONDER over Zoom on February 27, 2019.  In that meeting C. PONDER promoted life insurance, and in particular index universal life insurance policies ("IULs").  C. PONDER represented that IULs would generate a 7-11% annual return, Plaintiffs would be able to withdraw monies from the IULs without depleting assets, and the IULs would also provide long term care benefits.  He encouraged Plaintiffs to withdraw monies from their 401(k) and IRA accounts to purchase the IULs that he recommended.

17.     On March 21, 2019, Plaintiffs had another Zoom meeting with C. PONDER.  That same day, Plaintiffs each signed paperwork to purchase a total of four new IULs.

18.     Specifically, on March 21, 2019, Mr. Ermence signed paperwork with C. PONDER to purchase an IUL issued by Allianz Life Insurance Company Of North America ("Allianz IUL") with a death benefit of $2,426,412.00 and an IUL issued by National Western Life Insurance Company ("ME NWL IUL No. 1") with a death benefit of $188,253.00.  In addition, Mr. Ermence signed a personal financial questionnaire form in connection with the Allianz IUL on which all the entries were blank.

19.     Subsequently, C. PONDER or someone from his office filled out the personal financial questionnaire form after Mr. Ermence had signed the blank version of it.  The completed form states that the Plaintiffs' combined annual income was $515,000.00, that their net worth was $2,739,943.00, and that they had liquid assets of $1,585,923.00 which included $1,063,428.00 in cash in the bank.  Those entries were materially inaccurate and grossly over-stated the Plaintiffs' income, net worth and liquid assets.  Specifically, Plaintiffs' combined annual income in 2018 was $379,211.55.  Their net worth was approximately $1,500,000.00.   Plaintiffs had approximately $1,000,000.00 in liquid assets, which consisted of the monies in their IRA/401(k) accounts, not cash.

20.     On March 21, 2019, Mrs. Ermence signed paperwork with C. PONDER to purchase an IUL issued by Accordia Life & Annuity Company ("Accordia IUL") with a death benefit of $1,650,000.00 and an IUL issued by NWL with a death benefit of $203,483.00 ("CE NWL IUL").

21.    The handwriting on the application form for the Accordia IUL reflects that different people completed different parts of the application. The application for the Accordia IUL is also not complete because it fails to designate any beneficiaries.

22.    The Allianz IUL has annual premiums of $117,574.49 which are required to be paid for at least seven years. The Accordia IUL had an up-front premium of $100,000.00 and premiums of $30,000.00 thereafter. The NWL IULs which Plaintiffs purchased on March 21, 2019 each had a single premium of $75,000.00. The insurance coverage on both of the NWL policies was scheduled to lapse in 20 years, when Plaintiffs turned 70.

23.    On March 22, 2019, on C. PONDER's instructions and advice, the Plaintiffs each signed paperwork to surrender their Midland policies. Those monies were used to pay the premiums for the NWL IULs. This was not disclosed on the application paperwork for the NWL IULs, as was required.

24.    In April of 2019, Mr. Ermence had several communications with C. PONDER about how to generate the monies that were required to pay the initial premiums for the Allianz and Accordia IULs. C. PONDER suggested that Mr. Ermence sell stocks in his 401(k) brokerage account with Wells Fargo. Mr. Ermence expressed concerns about the tax implications of liquidating investments in his 401(k) account. C. PONDER assured him that he would implement tax reduction and elimination strategies in that same tax year to cushion any tax impacts. C. PONDER also emphasized the importance of diversification away from stocks. Mr. Ermence followed C. PONDER's advice. He sold stocks in his Wells Fargo brokerage account to fund the Accordia and Allianz IULs.

25.    C. PONDER did not take any actions to cushion the tax impact of the early withdrawals Mr. Ermence had made from his 401(k) accounts. On the contrary, Plaintiffs ended up incurring adverse tax ramifications from investing in the IULs because they were over-funded. That caused the IULs to become "Modified Endowment Contracts" on which distributions are taxed at ordinary income rates and subject to tax penalties for early withdrawals.

26.    In July of 2019, C. PONDER advised and caused Mr. Ermence to purchase a second IUL issued by NWL ("ME NWL IUL No. 2"). The ME NWL IUL No. 2 had a death benefit of

$344,079.00 and annual premiums of $30,279.00 a year. The application for the ME NWL IUL No. 2 was not dated or completely filled out as of when Mr. Ermence signed it.

27. C. PONDER also advised and caused Mr. Ermence to concurrently purchase a $150,000.00 single premium immediate life annuity issued by NWL ("NWL annuity") and to set up the NWL annuity so that its distributions would be paid to NWL to fund the ME NWL IUL No. 2. In addition, Mr. Ermence signed a suitability questionnaire that was not dated as of when Mr. Ermence signed it.

28. In July 2019, Mr. Ermence also purchased a secured note issued by Alpine Capital Management, LLC ("ALPINE note"), based on C. PONDER's recommendation and advice. The ALPINE note was secured by a mobile home located at 177 Countryside in St. Joseph, MO. The marketing material for the ALPINE note indicated that the borrower had a proven track record of timely payments. It also stated that, if the borrower is 90 days late on payments, ALPINE would buy the note back for the balance owed. Mr. Ermence signed an agreement for ALPINE's affiliated loan servicing entity to service the ALPINE note for a fee of 5% a month.

29. Throughout 2019, ANDERSON offered both live and online events to its "Titanium" members such as Plaintiff. Those events included asset protection and tax planning workshops, a real estate investor summit, online training and webinars, and "mastermind" groups. Plaintiffs attended several such events during 2019, including in person events in Texas, Las Vegas and California. ANDERSON provided presentations on tax planning, asset protection, stock market investing, life insurance and real estate investing at these events. Plaintiffs also met one-on-one with ANDERSON's personnel at these events to discuss their personal financial situation, investment goals, investments, tax planning and financial planning.

30. Plaintiffs' membership with ANDERSON included access to its tax professionals and retirement planning specialists, the creation of a customized wealth planning blueprint for Plaintiffs, assistance with creating a wealth plan, advice on retirement planning strategies, and an annual retirement plan review. Plaintiffs were provided with personalized financial planning and tax planning advice by Corey Posgay, a "senior strategist" with ANDERSON who was the Plaintiffs' assigned advisor at ANDERSON. Mr. Posgay describes himself as a senior advisor

who assists clients with liability and asset protection, tax mitigation, estate planning, living trusts, and retirement account options. Mr. Posgay undertook to develop a comprehensive personalized business and financial plan for Plaintiffs and to provide ongoing business, tax, and financial planning advice for them. Plaintiffs met with Mr. Posgay in person and over the phone on several occasions during 2019, including at workshops held in Nevada, Texas, and California. During those discussions, Plaintiffs and Mr. Posgay discussed Plaintiffs' business, real estate holdings, investments, retirement goals, and estate planning needs. On Mr. Posgay's advice, the Plaintiffs created a qualified retirement plan for themselves. Mr. Posgay advised the Plaintiffs to create the Qualified Retirement Plan, and regarding how much it should be funded with, and the assets with which it should be funded. Mr. Posgay also created an entity blueprint for Plaintiffs based upon their financial situation in which he advised them to form a designated number of entities, and how to structure those entities. Plaintiffs had multiple discussions with Mr. Posgay about how to create cash flow, wealth creation, and real estate investing. Plaintiffs entered into contracts with ANDERSON to pay it for forming the entities which Mr. Posgay had advised them to form and for the bookkeeping that was required for those entities.

31. Through ANDERSON, Plaintiffs were also introduced to Aaron Adams of Alpine, who promoted real estate investments and investments in mobile homes. Plaintiffs also learned about Solomon Floyd, who promoted investments in military housing, through one of ANDERSON's podcasts. Plaintiffs invested with both Mr. Adams and Mr. Floyd in reliance upon ANDERSON's promotion of their knowledge, skills and services and because they were held out as being part of ANDERSON's team of advisors.

32. In their discussions with ANDERSON's personnel, Plaintiffs informed them that they were working with C. PONDER with respect to insurance, and of the insurance investments and other investments which they had made through C. PONDER. Plaintiffs also informed ANDERSON of the investments that they had made through Mr. Adams and Mr. Floyd. Nobody from ANDERSON ever indicated to Plaintiffs that they had any concerns about C. PONDER's advice or the insurance policies/investments and other investments that the Plaintiffs were purchasing through C. PONDER or about Mr. Adams and/or Mr. Floyd, or the investments which

the Plaintiffs purchased through them.  Plaintiffs expected that ANDERSON would have advised them of any issues or concerns with the investments that the Plaintiffs had made through C. PONDER, Mr. Adams and Mr. Floyd because ANDERSON held each of them out to be part of its team of affiliated advisors.

33.    Plaintiffs are informed and believe and thereon allege that ANDERSON made an initial inquiry into Plaintiffs' financial circumstances and obligations and their present and anticipated obligations to and goals for their family, and kept itself informed of same throughout the duration of its relationship with Plaintiffs.  ANDERSON therefore knew that the Plaintiffs had invested substantial assets through C. PONDER into the IULs and the ALPINE note and that the Plaintiffs had also made substantial investments with Alpine and Solomon Floyd.  Further, if ANDERSON did not keep itself currently informed of the Plaintiffs' financial circumstances and obligations, including their investments with C. PONDER, Alpine and/or Mr. Floyd, then it violated the requirements set forth in NRS Section 628A.020.

34.    Plaintiffs made their last investment through C. PONDER in June of 2020. Specifically, in 2020, C. PONDER solicited Mr. Ermence to purchase an IUL issued by Equitrust ("Equitrust IUL").  Mr. Ermence was turned down for the Equitrust IUL for medical reasons as he had a major heart event in late 2019.  C. PONDER then suggested that the Equitrust IUL be issued on Mrs. Ermence's life although she did not need additional life insurance.

35.    The Equitrust IUL had an initial premium of $105,000.00.  Mr. Ermence liquidated investments in his 401(k) accounts to fund the premium.  The initial death benefit for the Equitrust IUL was $407,879.21.  However, the death benefit for the Equitrust IUL would decline over time to $272,000.00 unless the cash value grew by at least 6% a year.  It was highly likely that the cash value would not grow by anywhere near that amount because of how the Equitrust IUL was structured.

36.    The IULs which C. PONDER sold to the Plaintiffs are very expensive, complex and low return investments.  The Accordia and Allianz IULs and ME NWL IUL No. 2 all had high scheduled premium payments.  All of the IULs had substantial internal expenses and numerous limitations on the prospect of any meaningful growth in the cash value.  The substantial internal

charges assessed each month equaled or exceeded the amount of any interest credited to the IULs. The NWL IULs and the Equitrust IUL had no growth at all. Plaintiffs lost a substantial amount of their principal on the Accordia IUL and the Allianz IUL.

37. Further, from the outset, there was a risk that coverage on the Accordia and Allianz IULs and on ME NWL IUL No. 2 could be lost entirely unless premium payments are increased or the death benefits are lowered, if the interest earned was less than the overly rosy non-guaranteed projections. In addition, the Accordia and Allianz IULs and ME NWL IUL No. 2 could not be surrendered for many years without incurring substantial penalties. There was also no reasonable justification for selling the Plaintiffs so many IULs because the Plaintiffs did not need that much life insurance and they already had sufficient life insurance with their Midland policies which C. PONDER induced them to surrender.

38. The cash value of the IULs was never likely to grow because of the manner in which the indexed accounts are structured. Specifically, each of the indexed accounts are subject to caps on the amount of their growth and/or interest, and/or on the percentage of the premiums which is subject to any interest credits, which are set by the insurer, and which the insurer can adjust at any time. As a result, the insurers can ensure that the interest that is credited to those accounts is never more than 2%-3% a year, regardless of the growth in the underlying indices to which those accounts are indexed.

39. In addition, the IULs do not credit the indexed accounts with the same or similar level of return that Plaintiffs' monies would have earned if those monies had been directly invested into mutual funds that tracked the indices to which Plaintiffs' accounts were indexed or into the components of those indices. This is due to several factors. First, most of the accounts exclude dividends when calculating the increase in the indices, which is what the interest credits are based upon. Dividends account for a substantial amount of the growth of large cap equities, such as those in the S & P 500. Accordingly, by excluding dividends, the percentage of increase which is actually credited is significantly less than the total return of the indices. Further, the comparison in the growth of the indices is only done at two discrete points in time, which are one year apart. As a result, there could be minimal or no interest that is credited, even if the underlying indices

went up throughout the one-year term, if the indices declined on the last day of the term. This is significant because, although the stock market generally goes up over time, it does not go up in a straight line. The IULs also do not provide the benefit of compounding interest that one has when one directly invests into market investments. For these reasons, the likely growth potential for the IULs is 1%-2% a year, at best. It was far more likely that the cash value of the IULs would decline or stay flat, which is what occurred with all of Plaintiffs' IULs, because the internal charges exceeded the interest which is credited.

40.    The investments C. PONDER sold to Plaintiffs did not have the purported tax benefits that C. PONDER represented they had, and/or were not necessary in order for Plaintiffs to realize tax benefits, and/or were detrimental to Plaintiffs from a tax perspective. Specifically, the source of the monies which Plaintiffs invested through C. PONDER were monies which were already tax-deferred. Accordingly, there were no tax benefits for the IUL investments. Further, PONDER caused the Plaintiffs to over-fund the IULs, which turned them into "Modified Endowment Contracts" on which distributions are taxed at ordinary income rates and subject to tax penalties for early withdrawals.

41.    The ALPINE note was a high-risk investment that is only suitable for sophisticated investors who wish to speculate, and who are willing and able to bear the risk of losing the entire amount of their investment. The borrower on the ALPINE note was a high-risk borrower who did not qualify for a traditional loan and who had not been vetted by any independent source. Further, no independent due diligence or analysis had been done with respect to the value of the purported collateral for the ALPINE note, and whether that collateral was sufficient to compensate Mr. Ermence in the event of a default.

42.    The Plaintiffs were unaware of the foregoing facts. They relied upon C. PONDER and his advice, representations and promises.

43.    Plaintiffs lost their jobs in 2020 as a result of the COVID-19 pandemic. They therefore did not have the income to be able to pay out of pocket premium obligations of over $147,000.00 that came due on the Allianz and Accordia IULs. Mr. Ermence also did not have sufficient assets in his 401(k)/IRA accounts to make those payments because he had depleted most

of those assets to fund the initial premiums for the IULs, and because the Plaintiffs needed those monies for their living expenses. Plaintiffs therefore tried repeatedly to reach C. PONDER throughout the second half of 2020 to find how they could reduce their premium obligations and/or get their monies out of the IULs.

44. Mr. Ermence had a very serious heart event in November 2019 in which he was diagnosed as having tachycardia and a left bundle branch block. This event rendered him uninsurable going forward. By that time, he had surrendered the life insurance which he had with Midland. He was also unable to afford to pay for the IULs, as described above. He therefore had no viable alternative but to surrender the IULs, which left him without life insurance.

45. Plaintiffs ultimately had a Zoom meeting with C. PONDER in December of 2020. At this meeting, C. PONDER looked disheveled and like he was sitting in a closet. That eroded Plaintiffs' confidence in him.

46. In March of 2021, Mrs. Ermence initiated the process of surrendering the Equitrust IUL because it had a return of premium guarantee which ensured that Plaintiffs would receive back the entirety of the $100,000.00 that they had invested into it. The Equitrust IUL was on Mrs. Ermence's life, and therefore retaining it would not have helped Mr. Ermence with his insurance needs. C. PONDER became very upset with Plaintiffs when he learned that Mrs. Ermence wished to surrender the Equitrust IUL. He told Plaintiffs that his son, who C. PONDER had designated as the agent on the policy, would be charged back his commissions on the policy if Plaintiffs surrendered it. He asked Plaintiffs to contact him to find another option for generating monies. C. PONDER also reiterated that he had waived his standard "coaching" fee because he understood the Plaintiffs to be long-term investors and that there was no better or safer place to "park money" than in IULs.

47. C. PONDER's exhortations had the opposite effect of what he desired. Mrs. Ermence went through with surrendering the Equitrust IUL. Plaintiffs also surrendered the CE NWL IUL and the ME NWL IUL No. 1 in April and May of 2021 because those IULs guaranteed that the initial principal would be returned and Plaintiffs needed the money at that time.

Plaintiffs received the exact amount of their principal back from the Equitrust IUL, the CE NWL IUL and the ME NWL IUL No. 1.

48.    Mrs. Ermence surrendered the Accordia IUL in December 2021.  She incurred a substantial loss of principal on surrender.

49.    The ALPINE note had paid the promised income consistently in 2019 and throughout 2020.  However, in June of 2021, Mr. Ermence noticed that he had not received any payments on that investment in several months.  He therefore contacted ALPINE to find out what was going on.  ALPINE responded that the borrower on the ALPINE note had defaulted and that it had not been able to find another renter.  Mr. Ermence asked ALPINE why it had not told him about the default earlier.  He did not receive a responsive answer.  Mr. Ermence then asked ALPINE about selling the ALPINE note or having ALPINE buy it back, as it had represented it would do.  ALPINE waffled about that for months.  ALPINE ultimately repurchased the ALPINE note from Mr. Ermence for the amount of his principal, but not until early 2022, and only after numerous calls, emails and letters.

50.    Plaintiffs commenced a lawsuit against C. PONDER , Alpine, and the issuers of the IULs on April 14, 2022 in the San Bernardino County Superior Court in California, because that is where C. PONDER resided and had his office at that time.  At the time they filed their complaint, Plaintiffs were unaware of the referral relationship between C. PONDER and ANDERSON or of the nature and extent of their relationship.

51.    Starting in late 2022, Plaintiffs, through their California counsel, made diligent efforts to find out more information about the relationship between ANDERSON and C. PONDER and, specifically, whether C. PONDER and ANDERSON had any type of contractual or service relationship, whether C. PONDER introduced his clients to ANDERSON, and whether C. PONDER and ANDERSON had an ongoing financial, business and/or referral relationship with each other.  Plaintiffs' California counsel ultimately learned of facts which indicated that ANDERSON had an ongoing financial, business and referral relationship with PONDER SR. in late 2023 from other former clients of PONDER SR. and ANDERSON.  Specifically, Plaintiffs' California counsel learned from those other clients that: C. PONDER solicited multiple California

residents to purchase services from ANDERSON; C. PONDER provided his California customers with brochures and other information about ANDERSON; C. PONDER did so much business for ANDERSON that he had standardized ANDERSON "packages" that he offered to his clients; and C. PONDER's relationship with ANDERSON dated back to at least 2016.

52.     On January 18, 2024, promptly after learning of the foregoing information, Plaintiffs' California counsel submitted a DOE amendment to substitute Anderson Business Advisors, LLC into the California lawsuit as DOE 1.

53.     In the interim, the Plaintiffs had also become disillusioned with the quality of ANDERSON's services.   Anderson's advice included the creation of an incredibly complex business structure which the Plaintiffs learned they did not need, but which created unnecessary and expensive complexity while providing a revenue stream for ANDERSON. The unnecessary complexity in the Plaintiffs' organizational structure also led to the creation of three separate sets of books in QuickBooks, which not only increased costs but also complicated their financial management without any tangible benefits.   Plaintiffs ultimately paid additional monies to ANDERSON to dissolve the entities which they did not need in the first place.

54.     Plaintiffs' California counsel received the filed DOE amendment which added ANDERSON to the California lawsuit, effective January 18, 2024, on April 10, 2024.  On or about May 30, 2024, Plaintiffs' California counsel filed a motion for leave to file a First Amended Complaint in the California lawsuit which added claims against ANDERSON.  That motion was heard and granted on September 30, 2024.   ANDERSON was served with the First Amended Complaint in the California lawsuit on October 28, 2024.   ANDERSON responded to that complaint with a motion to dismiss the California lawsuit based on a Nevada venue provision in the contracts which the Plaintiffs had signed for corporate formation, corporate dissolution and bookkeeping services and a "mediation first" provision in those contracts.   Plaintiffs' California counsel believed in good faith that those venue and mediation first provisions did not apply because the claims asserted against ANDERSON in the California lawsuit did not relate to corporate formation, corporate dissolution or bookkeeping services and there was no claim asserted against ANDERSON for breach of contract.   However, the San Bernardino County

Superior Court ruled that the claims asserted in the California action arose out of the Plaintiffs' agreements with ANDERSON and stayed the California lawsuit pending mediation and litigation in California. Since that time, the parties have had a mediation in Nevada that was not successful, thereby satisfying the "mediation first" provision of the contacts.

55. C. PONDER filed for bankruptcy in July of 2024. Judgment was entered in Plaintiffs' favor and against C. PONDER in the bankruptcy court for the Western District of North Carolina in the amount of $231,353.31 on August 6, 2025.

56. ANDERSON held itself out as having extensive expertise in the areas of retirement planning, tax planning, and financial planning. ANDERSON also held C. PONDER out to have great experience and expertise in the areas of retirement planning, financial planning, wealth management, investments, and insurance. Plaintiffs are informed and believe, and thereon allege, that ANDERSON presented itself and presented C. PONDER as having great experience and expertise in retirement planning, financial planning, tax planning wealth management, investments, and insurance, so that Plaintiffs would rely upon them. As a result, Plaintiffs had great trust and confidence in ANDERSON and relied upon it and its purported advisor, C. PONDER, for investment and financial advice. Plaintiffs believed, at the time they made the investments at issue and up through early December of 2020, that C. PONDER possessed specialized skills and knowledge in the areas of retirement planning, financial planning, wealth management, investments and insurance. Plaintiffs also believed and still believe that ANDERSON has specialized skills in the areas of retirement planning, tax planning, and financial planning. For these reasons, the relationship between Plaintiffs and ANDERSON was fiduciary in nature. It was characterized by trust and confidence on the part of Plaintiffs toward C. PONDER, which trust and confidence was encouraged by C. PONDER.

57. Plaintiffs have suffered significant damage as a result of ANDERSON's conduct. The Plaintiffs lost $231,353.31 on the insurance investments and other investments which they made through C. PONDER, after applying monies received from settlements with the other defendants in the California lawsuit. Mr. Ermence also gave up affordable life insurance based on C. PONDER's advice and now would have to pay a very expensive premium to purchase life

insurance due to his heart condition which occurred after he gave up that life insurance. The estimated differential between the premiums Mr. Ermence was paying for the Midland policy which he gave up and the insurance he could currently obtain is $240,000. Plaintiffs also paid $41,108.25 directly to ANDERSON for services which did not benefit them and only served to cause Plaintiffs harm.

58.    Plaintiffs did not begin to have doubts about C. PONDER or discover his wrongdoing until early December of 2020. Plaintiffs first began to have concerns about ANDERSON's services around the spring of 2022, after three of the advisors ANDERSON had promoted had turned out to be fraudsters, and Plaintiffs were not realizing any benefits from the complex entity structure which ANDERSON had created on their behalf. Plaintiffs did not discover the existence of ANDERSON's referral relationship with C. PONDER or its role in his wrongdoing until late 2023. Further, because ANDERSON was added to the California lawsuit as a DOE defendant, the addition of ANDERSON to the California case relates back to its date of filing in April 2022.

**FIRST CAUSE OF ACTION**

**FRAUD-OMISSIONS**

59.    Plaintiffs re-allege and incorporate by reference each and all of the preceding paragraphs, as if set forth fully herein.

60.    Plaintiffs trusted and relied upon Defendant ANDERSON. ANDERSON encouraged such trust and confidence. ANDERSON held itself out as an expert in the areas of financial planning, wealth management, tax planning, business planning, and real estate. ANDERSON offered financial planning advice, tax advice, and business planning advice to Plaintiffs. Plaintiffs paid ANDERSON a substantial fee for those services. ANDERSON promoted and/or strongly implied that C. PONDER was affiliated with ANDERSON and on its team of trusted and expert advisors. For each and all of those reasons, ANDERSON owed Plaintiffs a fiduciary duty, including with respect to the services it provided to Plaintiffs and the investments, products, and transactions which ANDERSON and/or its agent C. PONDER solicited and/or recommended to the Plaintiffs.

61.     As Plaintiffs' fiduciary, ANDERSON had an affirmative duty to disclose all material facts known to it about C. PONDER, its relationship with C. PONDER, and the investments and transactions which C. PONDER recommended to Plaintiffs.

62.     ANDERSON also had a duty to disclose material facts to Plaintiffs because they had a special relationship which arose out of Plaintiffs' retention of ANDERSON to provide them with tax planning and financial planning and business planning services which included access to ANDERSON's team of advisors.  Plaintiffs trusted and had confidence in the expertise of ANDERSON and its purported team of advisors, which included C. PONDER, and ANDERSON encouraged and induced that trust and confidence.  The Plaintiffs believed at all relevant times that ANDERSON was a highly competent financial advisory and financial planning firm who was staffed with experts in retirement planning, financial planning, wealth management, tax planning, business planning, and real estate. The Plaintiffs contracted with ANDERSON to provide them with all aspects of personalized financial and business planning advice, which included referrals to other professionals and specialists within its network such as C. PONDER. ANDERSON agreed that it and its team of advisors would provide Plaintiffs with comprehensive financial planning and tax planning advice.

63.     Starting in February 2019, and continuously thereafter, ANDERSON omitted to disclose the following material facts regarding C. PONDER, its relationship with C. PONDER, and the investments which C. PONDER advised Plaintiffs to make:

A.  C. PONDER did not hold any securities licenses or financial planning licenses and was only licensed to sell insurance.  His other purported designations were wholly irrelevant to his purported services (such as a Canadian estate planning designation), or designations that one could obtain for a small fee and minimal study, or acronyms that did not correlate to any recognized designation;

B.  C. PONDER had no training or expertise in retirement planning;

C.  C. PONDER had previously filed for bankruptcy on three occasions;

D. ANDERSON had not vetted C. Ponder or checked his background;

E.  C. PONDER was not a life insurance expert.  He was nothing more than a sales

person who had little to no understanding of the products he sold;

F.   ANDERSON and C. PONDER had an extensive referral relationship where ANDERSON would allow C. PONDER to present and meet with clients at ANDERSON's events in exchange for C. PONDER referring his clients to ANDERSON for its services;

G.  C. PONDER either directly compensated ANDERSON for being allowed to speak and/or present at ANDERSON's events, or paid referral fees to ANDERSON for any clients who he met through ANDERSON who then purchased insurance or investment products through C. PONDER, and/or indirectly compensated ANDERSON by soliciting his clients to purchase expensive and unnecessary services which ANDERSON provided;

H. C. PONDER received compensation, referral fees, free advertising, marketing support and/or other benefits for referring his clients to ANDERSON;

I. ANDERSON received compensation, referral fees, free advertising, marketing support and/or other benefits from C. PONDER for referring its clients and workshop attendees to C. PONDER;

J.   The investments C. PONDER caused to be made on Plaintiffs' behalf were not diversified;

K.   C. PONDER and/or his office had inserted false information pertaining to the Plaintiffs' income, net worth, liquid assets, and other insurance on the forms Plaintiffs had signed for the IULs;

L.   C. PONDER did not disclose the amount of commissions, compensation and/or benefits that he, FWC, GRADIENT, and ANDERSON received as a result of Plaintiffs' purchases of the IULs;

M. The Accordia and Allianz IULs, and ME NWL IUL No. 2 carry large ongoing premium obligations which will have to be paid indefinitely in order to keep the IULs in force;

N. The premiums for the Accordia and Allianz IULs, and for ME NWL IUL No. 2. can be increased at any time at the sole discretion of the insurers;

O. The premium obligations and/or internal expenses of the IULs significantly outweigh any potential interest or return that could reasonably be anticipated to be earned under the terms of the IULs;

P. It was highly likely that the Accordia and Allianz IULs, and ME NWL IUL No. 2, would lapse within a few years of their issuance unless premium payments are increased or the death benefits are lowered because of their high internal costs and minimal potential for increase in the cash value;

Q. A significant portion of the premium payments for the IULs will be forfeited if the IULs are surrendered within the first ten to fifteen years of their issuance;

R. The monies within the IULs which were eligible for interest credits will and did earn significantly less than if Plaintiffs had directly invested into market investments which mirrored the indices that were used for the IULs. This is, because: i) the IULs do not include dividends in calculating the gains in the indices to be credited; ii) the comparison in the growth of the indices is done at just two discrete points in time, which are one year apart, without accounting for any gains that have occurred in the interim; and iii) growth is not compounded as it would have been had those monies been invested into a mutual fund or other market investments. Further, the issuers of the IULs can make changes to the IULs at any time that could result in a lower return or no return on the investment, including capping the amount of growth in the indices to be credited, and limiting the amount of the cash value that will be credited with interest;

S. The realistic return on investment in the IULs was and is, at best, 1% to 3% simple interest a year;

T. The purported guarantees of the IULs are dependent upon the solvency of the insurance companies who issued them;

U. The IULs were and are completely unsuitable for Plaintiffs in light of their income, assets, needs, risk tolerance, and investment goals;

V. C. PONDER had no reasonable basis for recommending the IULs to Plaintiffs;

W. Plaintiffs did not realize and will not realize any tax benefits from investing in the IULs because their monies were already tax-deferred;

X.  The commissions from the IULs were significantly higher than the commissions and compensation that Plaintiffs would have paid had their monies been used to purchase suitable investments;

Y.  The number of IULs which C. PONDER sold to Plaintiffs, and the amount of their face value, lacked any reasonable justification, because Plaintiffs did not need that much life insurance;

Z.  C. PONDER had caused premiums on one or more of the IULs to be paid by borrowing against another one of Plaintiffs' IULs;

AA.  The amount of interest charged on the policy loans which C. PONDER caused to be taken against the Plaintiffs' Midland policies and/or IUL(s) exceeded the actual and reasonably anticipated return on investment for the IULs;

BB. The IULS had become "Modified Endowment Contracts" with significant adverse tax ramifications due to C. PONDER's advice and instructions to over-fund them;

CC. PONDER did not disclose the amount of commissions, compensation and/or non-monetary benefits which he, FWC and ANDERSON received as a result of Plaintiffs' purchase of the ALPINE note;

DD. The borrower on the ALPINE note was a high-risk borrower who did not qualify for traditional loans and who had not been vetted by any independent source;

EE. No independent due diligence or analysis had been done with respect to the value of the purported security for the ALPINE note, and whether it was sufficient to compensate Plaintiffs in the event of a default;

FF.  C. PONDER had done no due diligence with respect to the ALPINE note;

GG. The compensation C. PONDER and FWC received as a result of Mr. Ermence's purchase of the ALPINE note was significantly more than the commissions and compensation that he would have paid had he purchased conventional investments which a licensed financial advisor could have utilized for him

HH. The anticipated interest for the ALPINE note was low, relative to the high risks associated with this investment;

II. Investments in publicly traded stocks and/or mutual funds have a historical return that is significantly higher than the promised return for the ALPINE note and are substantially less risky than the ALPINE note.

64.    Plaintiffs are informed and believe, and thereon allege, that ANDERSON knowingly omitted to disclose the above material facts regarding C. PONDER's background, its relationship with C. PONDER, and the investment products which C. PONDER recommended with the intent of deceiving Plaintiffs into investing a substantial portion of their retirement monies through C. PONDER, thereby obtaining substantial monies for itself either directly from those investments or through referrals which C. PONDER made for his customers to purchase services from ANDERSON.

65.    Plaintiffs were unaware of the true facts.  Plaintiffs reasonably trusted and relied upon Defendant ANDERSON, who held itself out to be knowledgeable and to have a high degree of expertise in the fields of retirement planning, financial planning, wealth management, investments, securities, insurance, tax planning, business planning, and real estate.

66.    As a direct and proximate result of Defendants' material omissions, alleged herein, the Plaintiffs invested most of their retirement monies with C. PONDER into investments he recommended, including the IULs and the ALPINE note.

67.    As a direct and proximate result of the material omissions, alleged herein, Plaintiffs have suffered damages in an amount according to proof.

68.    As a direct and proximate result of the material omissions, alleged herein, Plaintiffs have suffered substantial financial injuries, which has resulted in severe emotional distress.

69.    Defendant's conduct, in making material omissions as alleged herein, was fraudulent, malicious, willful, despicable, and oppressive.  Accordingly, punitive damages are warranted.

## SECOND CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

70.    Plaintiffs re-allege and incorporate by reference each and all of the preceding paragraphs, as if set forth fully herein.

71.     Plaintiffs trusted and relied upon Defendant ANDERSON and in the expertise of ANDERSON and its purported team of advisors, which included C. PONDER.  ANDERSON encouraged such trust and confidence.  ANDERSON held itself out as an expert in the areas of financial planning, wealth management, tax planning, business planning, and real estate. ANDERSON offered financial planning advice, tax advice, and business planning advice to Plaintiffs.  The Plaintiffs contracted with ANDERSON to provide them with all aspects of personalized financial and business planning advice, which included referrals to other professionals and specialists within its network such as C. PONDER. ANDERSON agreed that it and its team of advisors would provide Plaintiffs with comprehensive financial planning and tax planning advice Plaintiffs paid ANDERSON a substantial fee for those services.  ANDERSON promoted and/or strongly implied that C. PONDER was affiliated with ANDERSON and on its team of trusted and expert advisors. For each and all of those reasons, ANDERSON owed Plaintiffs a fiduciary duty under Nevada common law and as a financial planner pursuant to NV Statute 628A.010.

72.     ANDERSON, at all times herein relevant, had a fiduciary duty to act in Plaintiffs' best interests, perform the services it undertook to perform with reasonable care, and fully disclose any and all conflicts of interests.  ANDERSON also had a fiduciary duty to fully disclose all material facts concerning the advice and recommendations it provided.  ANDERSON had a fiduciary duty to refrain from making material omissions in its interactions with the Plaintiffs. ANDERSON had a fiduciary duty to only make recommendations and transactions that were for the primary benefit of Plaintiffs rather than for its primary benefit.  ANDERSON had a fiduciary duty to avoid conflicts of interest, and to fully disclose all such conflicts.  ANDERSON had a fiduciary duty to conduct adequate due diligence with respect to its affiliated advisors and the advisors it endorsed, including C. PONDER.

73.     ANDERSON is vicariously responsible for C. PONDER's acts and omissions because C. PONDER was its authorized agent, apparent agent, and/or ostensible agent who was acting in the course and scope of his agency in soliciting, recommending and selling investments to Plaintiffs.

74.    ANDERSON, acting through its agent, C. PONDER, breached its fiduciary duty to Plaintiffs in each and all of the following ways:

A.  C. PONDER false representations and failed to disclose material facts about the nature, features, risks and suitability of the IULs, as alleged herein;

B.  C. PONDER failed to explain the nature, risks and implications of the IULs in an accurate and objective manner that was reasonably understandable to Plaintiffs;

C.  C. PONDER advised the Plaintiffs to take out policy loans on their existing life insurance policies with Midland to use those monies to pay premiums for more costly IULs whose reasonable growth was less than the interest charged on the policy loans;

D.  C. PONDER caused Plaintiffs to take out policy loans to pay premiums on other policies, when the interest on those loans exceeded the return on the policies, and without notifying Plaintiffs of those loans;

E.  C. PONDER recommended investments to Plaintiffs which were unsuitable in light of their income, assets, needs, investment goals, risk tolerance, and insurance needs;

F.  C. PONDER failed to recommend any other investment options that could have been utilized for Plaintiffs and which would have been more appropriate for them;

G.  C. PONDER recommended investments which primarily benefitted himself and ANDERSON, rather than Plaintiffs;

H.   C. PONDER recommended investments which paid significantly more in commissions than suitable investments which a licensed financial advisor could have utilized for Plaintiffs;

I.  C. PONDER failed to comply with industry rules regarding suitability and knowing one's customers;

H.  C. PONDER failed to provide Plaintiffs with sufficient information to make an informed decision regarding whether to purchase the IULs;

I.  C. PONDER advised Plaintiffs to withdraw monies from tax-deferred accounts to pay premiums on the IULs;

J.  C. PONDER advised and caused Plaintiffs to over-fund the IULs, thereby turning them into "Modified Endowment Contracts" on which distributions are taxed at ordinary income rates and subject to tax penalties for early withdrawals;

K.  C. PONDER advised and caused Mr. Ermence to sign a blank version of the personal financial statement, and then later inserted information into it which was materially inaccurate and grossly over stated the Plaintiffs' income, net worth, and liquid assets;

L.  C. PONDER advised and caused the Plaintiffs to sign other forms that were not completely filled out as of when the Plaintiffs signed them;

M. C. PONDER failed to adequately or accurately explain the forms which Plaintiffs signed to the Plaintiffs;

N.  C. PONDER made false attestations regarding Plaintiffs' income, assets, liquid assets, and net worth.

O.  C. PONDER failed to disclose material facts about the nature, features, risks and suitability of the ALPINE note, as alleged herein;

P.  C. PONDER failed to explain the nature, risks and implications of the ALPINE note in an accurate and objective manner that was reasonably understandable to Plaintiffs;

Q.  C. PONDER failed to recommend any other investment options that could have been utilized for Plaintiffs and which would have been more appropriate for them;

R.  C. PONDER failed to conduct any due diligence, or adequate due diligence, as to the ALPINE note;

S.  C. PONDER failed to comply with industry rules regarding suitability, knowing one's customers, and the solicitation and sale of alternative investments;

T.  C. PONDER failed to provide Plaintiffs with sufficient information to make an informed decision regarding whether to purchase the ALPINE note.

U.  Plaintiffs are informed and believe and thereon allege that ANDERSON made an initial inquiry into Plaintiffs' financial circumstances and obligations and their present and anticipated obligations to and goals for their family, and kept itself informed of same throughout the duration of its relationship with Plaintiffs.  ANDERSON therefore knew that the Plaintiffs had

invested substantial assets through C. PONDER into the IULs and the ALPINE note and that the Plaintiffs had also made substantial investments with Alpine and Solomon Floyd.   Further, if ANDERSON did not keep itself currently informed of the Plaintiffs' financial circumstances and obligations, including their investments with C. PONDER, Alpine and/or Mr. Floyd, then it violated the requirements set forth in NRS Section 628A.020

75.   ANDERSON directly breached its fiduciary duty to Plaintiffs in each and all of the foregoing ways:

A.   ANDERSON omitted to disclose material facts, as alleged herein;

B.   ANDERSON recommended and endorsed C. PONDER to Plaintiffs as a highly experienced and knowledgeable insurance expert and retirement planning expert;

C.   ANDERSON failed to conduct adequate due diligence as to C. PONDER;

D.   ANDERSON failed to disclose the conflicts of interest that it had as a result of its financial and referral relationship with C. PONDER;

E.   ANDERSON failed to adequately mitigate the conflicts of interest which arose out of its financial and referral relationship with C. PONDER;

F.   ANDERSON failed to act in Plaintiffs' best interest with respect to its recommendation and endorsement of C. PONDER and instead acted in its own self-interest at Plaintiffs' expense;

G.   ANDERSON failed to act with reasonable care when it came to vetting C. PONDER and including him on its team of affiliated advisors;

H.   ANDERSON failed to act with reasonable care and competence with respect to the services for which Plaintiffs paid it.   Specifically, ANDERSON caused Plaintiffs to incur unnecessary expense to form numerous business entities which they did not need and from which they derived no benefit.   ANDERSON's advice created an undue administrative burden which resulted in an unnecessary and complex structure of Plaintiffs' business affairs.   This unnecessary complexity led to the creation of three separate sets of books in QuickBooks, which not only increased costs but also complicated Plaintiffs' financial management without any tangible benefits.

I.    ANDERSON's purported business planning, tax planning and financial advice primarily benefitted ANDERSON by increasing its billing while providing no benefit to the Plaintiffs;

J.    ANDERSON failed to conduct due diligence on and/or adequately vet other advisors who it recommended and/or introduced to the Plaintiffs, including a real estate advisor, Aaron Adams of Alpine Capital Solutions, and an advisor named Solomon Floyd who turned out to be running an illegal and fraudulent scheme.

76.    ANDERSON knew, or reasonably should have known, at all times herein relevant, that it had committed each and all of the breaches of fiduciary duty which are alleged herein.

77.    Plaintiffs trusted and relied upon ANDERSON, who was their fiduciary.

78.    As a direct and proximate result of the breaches of fiduciary duty, alleged herein, Plaintiffs have suffered damages in an amount according to proof.

79.    As a direct and proximate result of the breaches of fiduciary duty, alleged herein, Plaintiffs have suffered substantial financial injuries, which has resulted in severe emotional distress.

80.    ANDERSON's conduct, in breaching its fiduciary duties as alleged herein, was malicious, willful, despicable, and oppressive, if and to the extent such conduct is based upon what ANDERSON knew as opposed to what it reasonably should have known.  Accordingly, punitive damages are warranted against ANDERSON, to the extent its breaches of fiduciary duty were willful.

81.    Plaintiffs are entitled to recover their attorneys' fees from ANDERSON for its breaches of fiduciary duty pursuant to Nev. Rev. Stat. Section 628A.030 for tis breaches of fiduciary duty.

### THIRD CAUSE OF ACTION

### PROFESSIONAL NEGLIGENCE

82.    Plaintiffs re-allege and incorporate by reference each and all of the preceding paragraphs, as if set forth fully herein.

83.    Plaintiffs are informed and believe, and thereon allege, that Defendant ANDERSON, at all times relevant, acted as their financial planner, business advisor, tax advisor and real estate advisor.  ANDERSON held itself out as qualified and licensed to provide financial planning, business planning, tax planning, and real estate advice.

84.    Plaintiffs retained ANDERSON to perform professional services for them as their financial planner, business advisor, tax advisor and real estate advisor.

85.    ANDERSON held itself out as an expert in the fields of financial planning, wealth management, business planning, tax planning and real estate.  ANDERSON advised Plaintiffs with respect to financial planning, business planning, tax planning and real estate investments and performed services for Plaintiffs in those areas.  ANDERSON recommended and endorsed C. PONDER and his purported expertise and services.  Plaintiffs relied upon ANDERSON's recommendations, guidance, direction and advice.

86.    ANDERSON, by holding itself out as an expert in the fields of financial planning, wealth management, business planning, tax planning, and real estate, and by assuming the obligations associated with being Plaintiffs' business, tax, real estate and financial advisor, had a duty to properly and truthfully advise Plaintiffs and to act with reasonable care in making financial recommendations and offering financial advice, financial planning advice, tax planning advice, and business planning advice to Plaintiffs.

87.    ANDERSON is vicariously responsible for C. PONDER's acts and omissions because C. PONDER was its authorized agent, apparent agent, and/or ostensible agent who was acting in the course and scope of his agency in soliciting, recommending and selling investments to Plaintiffs.

88.    ANDERSON, through its agent C. PONDER, breached the foregoing duties which it owed to Plaintiffs in each and all of the following ways:

A.    C. PONDER failed to disclose material facts about the nature, risks and suitability of the ACCORDIA, ALLIANZ & NWL IULs and the ALPINE note, as alleged herein;

B.   C. PONDER failed to explain the nature, risks and implications of the ACCORDIA, ALLIANZ & NWL IULs and the ALPINE note in an accurate and objective manner that was reasonably understandable to Plaintiffs;

C.   C. PONDER recommended investments which were unsuitable for Plaintiffs in light of their ages, income, assets, liabilities, needs, investment goals, insurance needs, and risk tolerance;

D.   C. PONDER failed to recommend any other investment options that could have been utilized for Plaintiffs and which would have been more appropriate for them;

E.   C. PONDER failed to conduct any due diligence, or adequate due diligence, with respect to the ALPINE note;

F.   C. PONDER recommended investments which paid significantly more in commissions than suitable investments which a licensed financial advisor could have utilized for Plaintiffs;

G.   C. PONDER recommended investments which primarily benefitted himself and the other Defendants, rather than putting Plaintiffs' interests first;

H.   C. PONDER failed to comply with industry rules regarding suitability, knowing one's customers, and the solicitation and sale of alternative investments;

I.   C. PONDER failed to provide Plaintiffs with sufficient information to make an informed decision regarding whether to make the investments at issue;

J.   C. PONDER caused inaccurate information regarding Plaintiffs' income, assets, liquid assets, and net worth to be inserted on the forms which he caused them to sign in connection with their investments;

K.   C. PONDER failed to adequately or accurately explain the forms which Plaintiffs signed to them;

L.   C. PONDER made false attestations regarding Plaintiffs' income, assets, liquid assets, and net worth horizon on the forms he submitted on their behalf with respect to the investments at issue herein;

M.   C. PONDER instructed and caused Plaintiffs to sign forms in connection with their investments which were not completely filled in or dated as of when the Plaintiffs signed them.

89.   ANDERSON, on whose behalf C. PONDER acted, in breaching its duties as described above, failed to exercise reasonable care and to act with reasonable diligence.  Instead, ANDERSON, through its agent C. PONDER, acted negligently and carelessly and in disregard of its professional obligations and duties.

90.   ANDERSON also directly breached its duty to Plaintiffs in each and all of the foregoing ways:

A.   ANDERSON omitted to disclose material facts, as alleged herein;

B.   ANDERSON recommended and endorsed C. PONDER to Plaintiffs as a highly experienced and knowledgeable insurance expert and retirement planning expert;

C.   ANDERSON failed to act with reasonable care when it came to vetting C. PONDER and including him on its team of affiliated advisors;

D.   ANDERSON failed to act with reasonable care and competence with respect to the services for which Plaintiffs paid it, and instead caused Plaintiffs to incur unnecessary expense to form numerous business entities which they did not need and from which they derived no benefit. ANDERSON failed to act with reasonable care and competence with respect to the services for which Plaintiffs paid it.  Specifically, ANDERSON caused Plaintiffs to incur unnecessary expense to form numerous business entities which they did not need and from which they derived no benefit.  ANDERSON's advice created an undue administrative burden which resulted in an unnecessary and complex structure of Plaintiffs' business affairs.   This unnecessary complexity led to the creation of three separate sets of books in QuickBooks, which not only increased costs but also complicated Plaintiffs' financial management without any tangible benefits.  In addition, ANDERSON was negligent in its review of a 1099 contract which Plaintiffs had engaged them to review;

E.   ANDERSON failed to act with reasonable care when it came to vetting Aaron Adams and Solomon Floyd, and including them on its team of recommended and/or affiliated advisors.

F.   Plaintiffs are informed and believe and thereon allege that ANDERSON made an initial inquiry into Plaintiffs' financial circumstances and obligations and their present and anticipated obligations to and goals for their family, and kept itself informed of same throughout the duration of its relationship with Plaintiffs.   ANDERSON therefore knew that the Plaintiffs had invested substantial assets through C. PONDER into the IULs and the ALPINE note and that the Plaintiffs had also made substantial investments with Alpine and Solomon Floyd.   Further, if ANDERSON did not keep itself currently informed of the Plaintiffs' financial circumstances and obligations, including their investments with C. PONDER, Alpine and/or Mr. Floyd, then it violated the requirements set forth in NRS Section 628A.020.

91.   ANDERSON, in breaching its duties as described above, failed to exercise reasonable care and to act with reasonable diligence.   Instead, ANDERSON acted negligently and carelessly and in disregard of its professional obligations and duties.

92.   As a direct and proximate result of ANDERSON's negligence, alleged herein, Plaintiffs have suffered damages in an amount according to proof.

93.   Plaintiffs are entitled to recover their attorneys' fees from ANDERSON if and to the extent its negligence is found to rise to the level of gross negligence, pursuant to Nev. Rev. Stat. Section 628A.030.

## V.   DEMAND FOR JURY TRIAL

94.   Plaintiffs hereby demand a jury trial for all claims triable by jury.

## VI.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray judgment as follows:

1.   For compensatory damages in an amount according to proof;

2.   For damages in an amount according to proof for emotional distress and mental suffering;

3.   For punitive and exemplary damages in an amount sufficient to dissuade ANDERSON

from repeating its misconduct, and to serve as an example to similarly situated Defendants;

4. For attorneys' fees pursuant to Nev. Rev. Stat. Section 628A.030;

5.  For costs of suit herein; and

6.  For such other and further relief as this honorable court may deem just and proper.


Date: April 9, 2026                **GESUND & PAILET, LLC**


By: */s/ Keren E Gesund*
Keren E Gesund
Nevada Bar No. 10881
7464 West Sahara Ave
Las Vegas, NV 89117
Telephone: (702) 300-1180
Facsimile: (504) 265-9492
Email: keren@glolawfirm.com
*Attorneys for Plaintiffs*
*Carrie and Mark Ermence*